IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                        **REPORT AND
RECOMMENDATION**

v.

                                        10-CR-360(A)

ARLENE COMBS,
                           Defendant.
_____

      Defendant is charged in a Second Superseding Indictment [208][1] with, *inter alia*,

racketeering, conspiracy, and transportation of stolen merchandise in interstate and foreign

commerce. Before me is defendant's motion to suppress her statements dated October 14 and 22,

2010 [120]. An evidentiary hearing was held on January 27 and February 21, 2012 [206, 254,

255], followed by the parties' post-hearing submissions [266, 285]. Oral argument was held on

September 27, 2012 [290]. For the following reasons, I recommend that the motion be denied.


**HEARING TESTIMONY**

      <u>New York State Police Investigator Christopher Weber</u> - Investigator Weber

testified that on October 14, 2010, defendant Combs was picked up at her home at 214 Glenwood

Avenue in Rochester and transported to the State Police barracks in Henrietta (January 27, 2012

hearing transcript [254], p. 8). If she had said she wanted to leave, he would have had to make

some calls to see if he could release her (<u>id.</u>, p. 39). Prior to interviewing her, he read her

<u>Miranda</u> warnings from a card (<u>id.</u>, pp. 8-10). Combs said she understood and agreed to speak

_____
      [1]        Bracketed references are to CM-ECF docket entries.

(id., pp. 10-11). She left the room several times for cigarette or bathroom breaks, accompanied by an officer (id., p. 42).

She did not appear to be under influence of drugs or alcohol (id., p. 49), and appeared to understand his questions and answer them appropriately (id., pp. 16, 49). He prepared handwritten notes (gov't. ex. C2 [301-2]) and a typewritten statement (gov't. ex. C3 [302-1]). After completing the typewritten statement he gave it to her to review and make any changes she wished. She initialed and signed the Miranda warnings, initialed each page of the statement, and signed the last page (January 27, 2012 hearing transcript [254], p. 18). She read the statement and signed it. She never asked for a lawyer or to stop the questioning (id.). Following the questioning she was sent home (id., p. 19).

She returned to the barracks on October 22, 2010, accompanied by co-defendant Terry Stewart (id., p. 44). Investigator Weber admitted that he "may have told her that we're more interested in Rico Vendetti than her", and that he "might have told her on the 14th that we were not going to arrest her when we released her" (id., p. 45). Although he "absolutely" remembered telling her "that she may be arrested at some point, he admitted that that statement was not reflected in his notes (id.). He insisted that he never told Combs that if she cooperated she would not be charged, or that her statements would not be used against her (id., p. 51).

FBI Special Agent Michael McElhenny - SA McElhenny testified that he took a statement from defendant Combs at the State Police barracks in Rochester on October 22, 2010 (id., p. 55; gov't. ex. C6 [302-2]). Before questioning her, he presented her with an "Advice of Rights" form containing the Miranda warnings (id., p. 57; gov't. ex. C5 [301-3]). He asked her to read the form and whether she understood it and was willing to speak to him. She said that

she understood and was willing to speak, and signed the form (id.).  She did not appear to be under the influence of alcohol or drugs.  Her answers were appropriate to the questions being asked, and she appeared to understand what was going on (id., pp. 62-63).  She took two or three smoking breaks during her questioning, including at least one with co-defendant Terry Stewart (id., p. 61).  She never asked to stop the questioning, nor did she request an attorney (id., pp. 61-62).  He denied telling her that her statements would not be used against her, or that she would not be prosecuted (id., p. 62).  She was not handcuffed during her questioning (id., p. 70).

Arlene Combs - Ms. Combs testified that on October 14, 2010 she purchased and used five bags of heroin before arriving at her mother's house in Rochester at approximately 1:00 p.m. (January 27, 2012 hearing transcript [206], pp. 3-5).  At that time a police car arrived and an officer asked her for her driver's license.  She gave it to him and went into the house, where she sniffed another bag of heroin in the bathroom (id., p. 6).  She then came out of the house and the oficer who had her driver's license told her that she needed to come with them because they had some questions for her (id., p. 8).  She was placed in the back seat of the police vehicle, but was not handcuffed (id., pp. 7-8).  However, she did not feel free to leave (id., p. 8).

Upon arriving at the barracks, Investigator Weber escorted her into an interview room (id., pp. 9-10).  Again, she did not feel free to leave (id., p. 10).  She testified that she was not given Miranda warnings until "probably a couple hours" after she arrived at the barracks (id., p. 12).  She claims that within the first hour, at Terry Stewart's suggestion, she told Investigator Weber that "it would be best if I got an attorney" (id., pp. 12-13), but that Weber responded that they weren't after her, and she was not under arrest (id., p. 13).  However, although she had "a memory" of making that statement to Weber, she could not "say it was clear" (id., pp. 35-36).

She assumed she was a witness, because Weber told her she would not be arrested, and therefore she agreed to continue speaking to him (id., p. 14). She claims that Weber told her she would not ever be charged (id., p. 39).

In the days following October 14, 2010 Terry Stewart kept calling and telling her that Investigator Landahl wanted them to come in for further questioning, and she finally agreed to do so. On October 22, 2010 Terry Stewart's mother, Mary Stewart, drove them to the State Police barracks in Henrietta (id., p. 18). Before arriving she smoked "half a blunt" and used two bags of heroin (id., p. 19). After further questioning by State Police she was interviewed by SA McElhenny. She cooperated because she was told "they weren't really after me, that they wanted Rico [Vendetti], all I needed to do was cooperate" (id., pp. 21-22). She was given a Miranda "Advice of Rights" form (gov't. ex. C5 [301-3]) which she claims to have signed without reading (February 21, 2012 hearing transcript [255], pp. 9-10). She admitted that she did not request an attorney or seek to stop the questioning on that day (id., p. 10), and further admitted that she was not told she would not be arrested (id., p. 12).

She insisted that if they had told her they were interested in her as a suspect, she "would have pressed the issue of an attorney" (January 27, 2012 hearing transcript [206], p. 23). Although she admitted signing and initialing the Miranda warnings on her statement (gov't. ex. C3 [302-1]), she stated that she did "not really" read the warnings: "By the time I signed this, I had already done another bag of heroin. I just didn't care. I just wanted to go home. I didn't think I was under arrest"(id., p. 24). She admitted that the portion of the statement in which she denied being under the influence of drugs was a lie (id., pp. 30-32, 39). She "was very much addicted to heroin and couldn't get on during the day without it" (id., p. 32), and "[w]hat was

very important . . . at the time was to get out, go home, get high" (id., p. 34). "I assumed if I gave them all the information they wanted and did what they wanted, I could leave and get high" (id., p. 38).

## ANALYSIS

In moving to suppress her October 14 and 22, 2010 statements, Combs argues that she was in custody on both dates, that she was not given timely Miranda warnings on October 14, that her requests for counsel were ignored, and that she was deceived by the government's assurances that she would not be arrested and that the sole target of the investigation was co-defendant Rico Vendetti. Defendant's Post-Hearing Brief [285].

None of these arguments are persuasive. Combs was entitled to Miranda warnings, or to terminate questioning upon a request for counsel, only if she was in custody at the time of her questioning. *See* United States v. Newton, 369 F.3d 659, 669 (2d Cir.), cert. denied, 543 U.S. 947 (2004) ("Miranda's warning requirements apply only to custodial interrogation"); United States v. Medunjanin, 2012 WL 1514766, *7 (E.D.N.Y. 2012) ("the Fifth Amendment right to counsel applies when a defendant is subject to custodial interrogation"); United States v. Ellison, 632 F.3d 727, 730-31 (1st Cir.), cert. denied, 131 S.Ct. 295 (2010) ("Ellison also argues that the interrogation should have ceased once he invoked his right to counsel . . . . But even if Ellison had clearly expressed a desire to speak with a lawyer, he could not have invoked any constitutional right to do that in a non-custodial interrogation conducted before he was formally charged").

"[A] noncustodial situation is not converted to one in which <u>Miranda</u> applies simply because . . . the questioning took place in a coercive environment . . . . Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977).  Instead, an interrogation is deemed "custodial" only where "a reasonable person would not have thought himself free to leave" *and*  "in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest".  <u>Newton</u>, 369 F.3d at 672. "Only if the answer to this second question is yes was the person in custody . . . and entitled to the full panoply of protections prescribed by <u>Miranda</u>".  <u>Id.</u>[2]  In determining whether an individual was in custody, the court "must examine all of the circumstances surrounding the interrogation".  <u>Id.</u> at 670.

Having considered all of the circumstances surrounding Combs' interrogation on October 14 and 22, 2010, I conclude that no reasonable person would have considered their freedom of action to have been curtailed to a degree associated with formal arrest, and that Combs was therefore not in custody at the time of her statements. She admits that she was not handcuffed on October 14, and was repeatedly told that she was not under arrest.  *See* <u>United States v. Mitchell</u>, 2012 WL 6827387, *10 (W.D.N.Y. 2012) (Feldman, M.J.), <u>adopted</u>, 2013 WL 132459 (W.D.N.Y. 2013) (Larimer, J.) (*quoting* <u>United States v. Newton</u>, 369 F.3d 659, 676 (2d

---

[2]     Combs admits that <u>Miranda</u> warnings were given on both dates, but contends that they were given too late on October 14. However, the fact that warnings were given "do[es] not, in and of itself, create custodial interrogation, but [is] just one factor to consider".  <u>Mastowski v. Superintendent</u>, 2011WL 4955029, *10 (W.D.N.Y. 2011) (Telesca, J.).

Cir. 2004), cert. denied, 543 U.S. 947 (2004)) ("Mitchell was never handcuffed, a form of restraint 'generally recognized as a hallmark of a formal arrest' . . . . Funderburk never advised Mitchell that he was under arrest or was going to be arrested"). She was also allowed to take breaks and to meet with codefendant Terry Stewart, none of which would have been allowed for someone under arrest.

Nor was she in custody on October 22, when she voluntarily returned to the barracks. "A person who voluntarily accompanies the police to the station for questioning, without more, is not in custody. Nor does the interview room setting convert the noncustodial situation to one in which Miranda applies." Irizarry v. Ercole, 2013 WL 139638, *4 (S.D.N.Y. 2013).

Having found that Combs was not in custody at the time of her statements, I conclude that she was not entitled to Miranda warnings, nor was the government required to cease questioning upon a request for counsel. In any event, I credit the testimony of Investigator Weber and SA McElhenny that Miranda warnings *were* timely administered, and that Combs did not ask to speak to an attorney.

Combs further argues that "[h]er statements were a product of a course of conduct by the Government . . . to overcome [her] ability to fully comprehend the severity of her circumstances with promises and assurances that she would not be arrested and that the Government was only interested in Rico Vandetti [*sic*]". Defendant's Post-Hearing Brief [285], p. 7. "This can clearly be ascertained from a reading of Exhibit 'C3' in evidence. The contents of the entire Exhibit 'C3' focuses on the involvement of Mr. Vandetti [*sic*] in the Medina robbery." Id., p. 6.

No one reading ex. C3 [302-1] could possibly come to that conclusion. That document, which Combs both initial and signed, advised her of her right to remain silent, of the fact that any statement which she makes can and will be used against her in a court of law, of her right to have an attorney present and to have an attorney appointed if she cannot afford one, and of her right to stop at any time.  Id., p. 1 of 4. Combs expressly confirmed in that document that she had been advised of her Miranda rights, that she understood those rights, that no threats or promises had been made to her, and that everything in the statement was the truth.  Id., pp. 1 and 4 of 4.  She acknowledged the receipt of identical warnings on October 22, 2010 by signing the "Advice of Rights" form (ex. C5 [301-3]).

I am unpersuaded by Combs' attempt to disavow the significance of those documents by claiming that she did not read them (which testimony I find to be incredible).  In any event, "parties are charged with knowing and understanding the contents of documents they knowingly sign . . . . If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him." Horvath v. Banco Comercial Portugues, S.A., 2012 WL 497276, *1 (2d Cir. 2012) (Summary Order).

Moreover, whether she read them or not, the fact that these documents expressly advised her of the possibility that her statements could be used against her in court completely undercuts her argument that the government (which could not have anticipated that she would *not* read them) deceived her into believing that she would not be charged.

## CONCLUSION

For these reasons, I recommend that defendant Comb's motion to suppress [120] be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by February 8, 2013 (applying the time frames set forth in Rules 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

DATED:       January 22, 2013

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge